## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PETER VEGA,** | : | **CIVIL ACTION NO. 1:22-CV-593** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. WETZEL,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

### MEMORANDUM

This is a prisoner civil rights case filed pursuant to 42 U.S.C. § 1983. Plaintiff, Peter Vega, alleges that defendant prison officials and medical personnel were deliberately indifferent to a serious medical need and committed medical malpractice when they failed to adequately treat his liver, kidney, and stomach conditions. Defendants Wetzel, Little, Mason, White, Houser, and Doe ("Commonwealth Defendants") have moved to dismiss, and Vega has moved for leave to supplement. The motions will be granted.

### I.   Factual Background & Procedural History

Vega has been incarcerated in Mahanoy State Correctional Institution ("SCI-Mahanoy") at all relevant times. According to the complaint, he began seeing defendant Loscalzo, a doctor in the prison, for medical treatment beginning in 2020. (Doc. 1 at 6). Loscalzo purportedly diagnosed Vega with an unspecified liver disease and other unspecified illnesses. (Id.)

Prior to Vega beginning treatment with Loscalzo, defendant Williams, a physician's assistant in the prison, allegedly prescribed him Pravastatin and

Gemfibrozil, which can purportedly cause severe side effects when taken together. (Id.)  The complaint asserts that Loscalzo told Williams to discontinue these prescriptions, but that Williams declined to do so.  (Id.)

In April or May of 2020, Vega was allegedly taken to the prison's medical department because he was vomiting and experiencing pain in his abdomen.  (Id. at 7).  He remained there for observation overnight before being seen by Loscalzo the following morning.  (Id.)  Loscalzo sent Vega to the emergency room at Lehigh Valley Hospital.  (Id.)  He was admitted and hospitalized for five days due to an obstruction in his stomach.  (Id.)  This obstruction had allegedly been observed by SCI-Mahanoy medical personnel prior to this incident but had been dismissed as a passing stomach virus.  (Id.)

A week after returning from the hospital, Vega met with Loscalzo to discuss the results of blood testing and ultrasounds that were performed at the hospital. (Id.)  Loscalzo ordered additional blood testing to determine the cause of other health issues found by hospital staff.  (Id.)  After receiving the results of the blood tests, Loscalso purportedly told Vega that he had diabetes and liver problems.  (Id.) Loscalzo ordered a series of blood tests to determine whether the liver problems were caused by hepatitis or HIV.  (Id.)  All of these tests were negative.  (Id. at 7-8).

The complaint avers that during one of Vega's appointments, Loscalzo checked his medical records and stated, "I told PA. Williams to take you off this medication," purportedly in reference to Vega's Pravastatin and Gemfibrozil prescriptions.  (Id. at 8).  Loscalzo immediately discontinued Vega's Pravastatin prescription.  (Id.)  Sometime after Loscalzo discontinued the prescription,

defendant Bora, another physician in the prison, prescribed Vega Lipitor and

Aldactone, which allegedly cause similarly harmful side effects.  (Id. at 23).

   During this meeting, Loscalzo purportedly concluded that Vega had an

unspecified liver disease and referred him for an appointment with Dr. Macelli, an

oncologist at Lehigh Valley Hospital.  (Id. at 8).  Prior to being seen by Macelli, Vega

was sent to Lehigh Valley Hospital on an unspecified date for complaints of

abdominal and liver pain.  (Id.)  The doctor who examined him allegedly diagnosed

him with liver scarring, cirrhosis of the liver, and a fatty liver.  (Id.)  In October 2020,

Vega had a telemedicine appointment with Macelli, who referred him to a liver

specialist for a biopsy and endoscopy.  (Id.)

   Sometime in January or February of 2021, Vega was allegedly transported to

Geisinger Medical Center, where he was seen by Dr. Shah.  (Id.)  Dr. Shah allegedly

did not examine Vega or ask him any questions but asked his assistant why Vega

had been brought to the hospital.  (Id. at 8-9).  The assistant responded that Vega

had been sent for treatment of his liver conditions.  (Id. at 9).  Shah supposedly told

the correctional officers escorting Vega to return him to SCI-Mahanoy, but before

they left Vega asked him whether the biopsy and endoscopy recommended by

Macelli could be performed at the hospital.  (Id.)  Shah, after confirming with his

supervisor that the procedures could be performed at the hospital, scheduled them

for April 2021.  (Id.)

   Several months later, Vega had a telemedicine appointment with Macelli and

defendant Badick, a physician employed by the prison.  (Id.)  Vega asked them

about the biopsy and endoscopy.  (Id.)  Badick responded that someone had

canceled the appointment. (Id.) He rescheduled it for a later date, but the complaint asserts that the biopsy and endoscopy were never done. (Id.)

Defendant Bora began employment with the prison as a physician and began treating Vega around this time. (Id.) Vega asked Bora why he was having liver complications after being in prison for 35 years. (Id. at 9-10). Bora supposedly stated that Vega was a heavy drinker when he was younger and that liver complications could arise from heavy drinking "even after 50 years." (Id. at 10). Vega responded that he had never been a heavy drinker. (Id.) Sometime after this visit, he went to the medical department based on complaints that he was feeling sick. (Id.) Defendant Williams examined him and purportedly stated that there was nothing the medical department could do to treat his liver condition and that the liver was "very enlarged." (Id.) Sometime in June or July of 2021, Vega attended an appointment with defendant Badick, who allegedly stated that Vega might need to have his gallbladder removed. (Id. at 18).

The complaint avers that Vega waited for treatment for "several months" before he was transported to Geisinger Medical Center on November 8, 2021, for an appointment with Shah. (Id. at 10). Staff at the hospital informed the correctional officers escorting Vega that there was no appointment scheduled that day. (Id.) Vega was transported back to the prison. (Id.)

On November 16, 2021, Vega had a telemedicine appointment with Macelli and Bora. (Id. at 11). Bora explained that the appointment with Shah had been canceled because Geisinger needed to switch doctors to treat Vega. (Id.) Macelli stated that he wished to have the biopsy and endoscopy performed on Vega to

determine whether Vega had cancer, but stated that it was up to the prison's medical department to ensure that Vega was able to attend the appointments. (<u>Id.</u>)

On December 9, 2021, Vega met with defendant Williams and "Aby," the assistant to the prison's correctional health care administrator. (<u>Id.</u>) Aby said she had spoken with Shah, who allegedly stated that the biopsy and endoscopy were no longer necessary. (<u>Id.</u>) Vega continued to feel abdominal, kidney, and liver pain. (<u>Id.</u>) He attended a sick call in the medical department in January 2022 where he was examined by physician's assistant Westly Kiepea. (<u>Id.</u> at 12). Kiepea obtained a urine sample from Vega, which tested positive for blood and kidney infections. (<u>Id.</u>) Kiepea prescribed him antibiotics and Motrin, ordered blood testing, and told him to come back ten days later if the pain continued. (<u>Id.</u> at 12-13.)

Vega returned to the medical department twelve days later, where he was examined by defendant Christina Houser, the prison's correctional health care administrator. (<u>Id.</u> at 13). Houser allegedly obtained a urine sample from Vega, which was positive for kidney and blood infections. (<u>Id.</u>) Houser, after unsuccessfully attempting to have an outside physician examine Vega that night, told him that he would need to stay in the medical department overnight before he could be examined by a physician's assistant in the morning. (<u>Id.</u>)

The next morning, Vega was examined by physician's assistant O'Brien. (<u>Id.</u>) O'Brien asked him if he was still in pain and whether he was ready to go back to his housing unit. (<u>Id.</u>) Vega confirmed that he was ready to return to the housing unit, and O'Brien discharged him, allegedly without examining Vega or asking him any questions as to why he was in the infirmary. (<u>Id.</u>)

Vega attended mandatory sick call sometime in the third week of January. (Id. at 13-14).  Defendant Williams told him to go into an examination room.  (Id. at 14).  Williams then allegedly "said something" to O'Brien, at which point O'Brien approached Vega "with an attitude" and asked him to come into his examination room.  (Id.)  Vega told O'Brien he would not go into the room unless a lieutenant was present because he did not want O'Brien to misconstrue anything he said.  (Id.) O'Brien allegedly told Vega to leave the infirmary because he was refusing treatment.  (Id.)  The complaint avers that Vega asked for a lieutenant to be present because Vega had recently filed a grievance against O'Brien and he worried that O'Brien would retaliate against him.  (Id.)  Vega returned to his housing unit and spoke to defendant Mason, the prison's superintendent, during the prison's lunch hours.  (Id.)  Vega told her about the purported lack of medical care he was receiving.  (Id.)

Vega was called to the medical department later that day, where he spoke with defendants Bora and Houser.  (Id.)  Bora admitted Vega into the infirmary and placed him on an IV for several days before he was discharged.  (Id. at 15).  Bora told Vega that he was scheduled for a consultation with Shah in the near future in preparation for an endoscopy.  (Id.)

Vega continued to feel the same symptoms in the last week of January 2022 and sought treatment in the medical department.  (Id.)  Defendant Bora admitted him into the infirmary and obtained a urine sample, which was allegedly positive for kidney and blood infections.  (Id.)  Bora placed him on an IV and prescribed antibiotics.  (Id.)

6

Vega was given several blood tests and an ultrasound on his kidneys in February 2022.  (Id.)  Nurse practitioner "Angela" reviewed the ultrasound results with him later that month and informed him that his kidneys appeared to be functioning normally and that he had a fatty liver.  (Id. at 15-16).  Vega explained that he had been diagnosed with cirrhosis of the liver, liver damage, fatty liver, and an unspecified liver disease, but Angela allegedly told him that the prison could not do anything for him until his liver completely failed.  (Id. at 16).  Vega then had a telemedicine appointment on February 10, 2022 with Macelli, who purportedly recommended that Vega be seen by a different liver specialist in lieu of Shah.  (Id.)

During the first week of March 2022, Vega spoke with defendant Mason and explained to her that he was still not receiving adequate medical care.  (Id.)  The next day, he was called for mandatory sick call and examined by Dr. Wheeler.  (Id.)  Wheeler purportedly found that Vega's liver was enlarged and informed Vega that he would be seen for an endoscopy sometime in the near future.  (Id.)

On March 7, 2022, Vega was sent to the medical department after he urinated blood.  (Id. at 17).  An unnamed nurse in the medical department examined him and obtained a urine sample, which allegedly contained an "excessive" amount of blood.  (Id.)  The nurse opined that Vega may have kidney stones and that if the kidney stones were too big there would be nothing that could be done for him at the prison.  (Id.)  He was called for mandatory sick call again the next day and spoke with defendant Williams.  (Id.)  Williams told him he would be referred for an ultrasound on his bladder.  (Id.)

On March 11, 2022, Vega had an appointment with defendant Bora, who asked him whether he had been taken to an outside hospital for the endoscopy. (Id.)  Vega stated that he had not been taken anywhere.  (Id.)  Bora then examined Vega's file, which allegedly stated that prison staff had been unsuccessfully attempting to reach Shah regarding Vega's endoscopy.  (Id.)  Bora purportedly stated that she would personally contact Shah.  (Id.)  Bora also stated that Vega continuing to urinate blood was not normal and that he would be referred for an appointment with a urologist.  (Id.)  Finally, Bora diagnosed Vega's liver condition as nonalcoholic steatohepatitis ("NASH"), which purportedly causes fatty liver and cirrhosis not related to alcohol abuse.  (Id. at 18).

The complaint avers that prison physicians and healthcare administrators had delayed care for over eighteen months at the time of the complaint after Vega's liver, kidney, and stomach problems were first diagnosed in 2020.  (Id. at 19).  Vega asserts that based on his own research and knowledge of his condition, he actually suffers from "Budd's Cirrhosis,"[1] rather than NASH or an unspecified liver disease as diagnosed by defendants.  (Id. at 20).

The complaint asserts claims for deliberate indifference to a serious medical need and medical malpractice.  (Id. at 26-28).  Mason, Houser, Loscalzo, Badick, and Bora are named as defendants, along with John E. Wetzel, the former secretary of

---

[1] The court assumes this refers to Budd-Chiari Syndrome.  See *Budd-Chiari Syndrome*, WIKIPEDIA, https://en.wikipedia.org/wiki/Budd%E2%80%93Chiari_syndrome (last visited Mar. 1, 2023); *Budd-Chiari Syndrome*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/21097-budd-chiari-syndrome (last visited Mar. 1, 2023).

the Pennsylvania Department of Corrections ("DOC"); George M. Little, the current

secretary of the DOC; Ms. L. White; and Shannon Doe, the DOC's director of

healthcare services.  (Id. at 1-5). Vega seeks injunctive relief requiring him to be

examined by an independent hospital not contracted by the DOC and damages of at

least $1 million.  (Id. at 26).

Defendants Wetzel, Doe, and Houser moved to dismiss the complaint on July

1, 2022.  (Doc. 12).  Defendants argue that the claims against Wetzel and Doe should

be dismissed for lack of personal involvement and that the claims against Houser

should be dismissed for failure to state a deliberate indifference claim upon which

relief may be granted.  (Doc. 13).  Vega filed a motion to supplement on November

23, 2022, seeking to add as defendants O'Brien; Shah; Gerard Francis, the founder

of Wellpath Corporation; and Jerry Boyle, the former CEO of Wellpath.  (See Docs.

25, 25-1).  Vega alleges that WellPath, the DOC's medical services subcontractor,

maintains a corporate policy to deny necessary medical care to inmates to save

money.  (Id.)  Vega also seeks to add additional allegations as to how existing

defendants were personally involved in the alleged civil rights violations.  (Id.)

Vega moved for default judgment against defendants Mason, Loscalzo,

Badick, Williams, White, and Bora on December 7, 2022.  (Docs. 26-31).  The court

denied the motions on December 8, 2022, noting that Mason, White, and Loscalzo

had not been served with process due to an apparent oversight by the Clerk of

Court and that Badick, Bora, and Williams had not been served because they had

declined to waive formal service of process.  (Doc. 32).  The court directed the Clerk

of Court to serve Mason, White, and Loscalzo with copies of the complaint and

9

directed the United States Marshals to serve Badick, Bora, and Williams with process.  (Id.)

On January 18, 2023, Defendants Mason, White, and Little moved to join the motion to dismiss filed by defendants Wetzel, Doe, and Houser.  (Doc. 47). Defendants assert that the same personal involvement argument raised by defendants Wetzel and Doe applies to the claims against White and Little and that the same failure to state a claim argument raised by defendant Houser applies to the claims against Mason.  (Id.)  Defendants Badick, Bora, Loscalzo, and Williams ("medical defendants") answered the complaint on February 3, 2023.  (Doc. 48). Vega opposed the motion to join the motion to dismiss on February 10, 2023 and sought reconsideration of the court's order denying his motions for default judgment.  (Doc. 50).  The motion to dismiss, the related motion to join, and the motion to supplement are ripe for disposition.  We will also address Vega's motion for reconsideration as part of a global resolution of matters pending before the court.

## II.    <u>Legal Standard</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quoting <u>Pinker v. Roche Holdings,</u>

Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents."  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

Courts must liberally construe complaints brought by *pro se* litigants.  <u>Sause v. Bauer</u>, 585 U.S. __, 138 S. Ct. 2561, 2563 (2018).  *Pro se* complaints, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)).

### III.   <u>Discussion</u>

Vega brings his constitutional claims under 42 U.S.C. § 1983.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law.  <u>See</u> <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284-85 (2002); <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  <u>Kneipp</u>, 95 F.3d at 1204 (quoting <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995)).

At the outset, we will deny Vega's request for reconsideration of the denial of default judgment as untimely.  The request for reconsideration was filed on February 10, 2023, approximately two months after the court's order denying Vega's motions for default judgment.  (<u>See</u> Docs. 32, 50).  Under Local Rule 7.10, motions for reconsideration must be filed within fourteen days after entry of the relevant order.  We will also grant defendants Little, Mason, and White's motion to join in the other defendants' motion to dismiss in the interest of judicial economy because

Little, Mason, and White's arguments for dismissal are essentially identical to the arguments raised in the motion to dismiss.

Turning to the substantive arguments for dismissal, we will dismiss Vega's claims against defendants Wetzel, Little, White, and Doe for lack of personal involvement.  A defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation.  Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 289 (3d Cir. 2018).  The defendant's personal involvement cannot be based solely on a theory of *respondeat superior*.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Rather, for a supervisor to be liable for the actions of a subordinate, there must be allegations of personal direction or actual knowledge and acquiescence.  Id.  Wetzel, Little, White, and Doe are not mentioned anywhere in the complaint's factual allegations.  Accordingly, the complaint fails to plead their personal involvement in the alleged civil rights violations.

The claims against Mason will likewise be dismissed for lack of personal involvement.  The only allegations against Mason are that Vega told her about his supposed lack of medical care on two occasions.  (See Doc. 1 at 15-16).  There is no allegation that Vega asked Mason to remedy the lack of medical care or that she failed to do so in any way, nor is there any allegation that she acquiesced in the other defendants' alleged decisions to deny him medical care.

The claims against Houser will be dismissed for failure to state a claim upon which relief may be granted.  Vega asserts claims against Houser for deliberate indifference to a serious medical need and medical malpractice.  Prima facie claims of deliberate indifference require allegations of "(i) a serious medical need, and (ii)

acts or omissions by prison officials that indicate deliberate indifference to that need." <u>Natale v. Camden Cty.</u> Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999)).  Medical malpractice claims under Pennsylvania law require allegations that (1) defendant owed plaintiff a duty of care; (2) defendant breached the duty; (3) defendant's breach was the proximate cause of plaintiff's injuries; and (4) plaintiff suffered damages as a result of the breach.  <u>Mitchell v. Shikora</u>, 209 A.3d 307, 314 (Pa. 2019) (citing <u>Hightower-Warren v. Silk</u>, 698 A.2d 52, 54 (Pa. 1997)).  The only allegations against Houser are that she examined Vega on one occasion in the prison's medical department, obtained a urine sample from him that was positive for blood and kidney infections, and then admitted him into the infirmary overnight so that he could be examined by a physician's assistant the next morning.  (Doc. 1 at 13).  These actions are insufficient to allege deliberate indifference or malpractice.  It appears from the four corners of the complaint that Houser diligently treated Vega and did not harm him in any way.

Before dismissing a civil rights complaint for failure to state a claim upon which relief may be granted, a district court must permit a curative amendment unless the amendment would be inequitable or futile.  <u>Phillips</u>, 515 F.3d at 245.  We will grant leave to amend in this case because the dismissed claims are factually, rather than legally deficient.

We will additionally grant Vega's motion for leave to supplement.  Federal Rule of Civil Procedure 15 governs the filing of both amended and supplemental pleadings.  <u>See</u> Fed. R. Civ. P. 15(a), (d).  Rule 15(a) contemplates amendment of an existing pleading and is intended "to enable a party to assert matters that were

overlooked or were unknown" when the original pleading was filed.  Garrett v. Wexford Health, 938 F.3d 69, 82 (3d Cir. 2019) (quoting 6 CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1473 (3d ed. 2019)).  By contrast, Rule 15(d) contemplates a supplemental pleading that sets out "any transaction, occurrence, or event that happened *after* the date of the pleading to be supplemented."  FED. R. CIV. P. 15(d) (emphasis added); see also Garrett, 938 F.3d at 82.  The standard for granting leave under both rules is essentially the same.  See 6 WRIGHT & MILLER, *supra*, § 1504 (citing, *inter alia*, Micron Tech., Inc. v. Rambus Inc., 409 F. Supp. 2d 552, 558 (D. Del. 2006)).

Under Federal Rule of Civil Procedure 15, leave to amend should be freely given "when justice so requires."  FED. R. CIV. P. 15(a)(2).  In the seminal case of Foman v. Davis, 371 U.S. 178 (1962), the Supreme Court of the United States provided guidance for when leave to amend may be denied.  The circumstances that weigh against granting leave include undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility.  Foman, 371 U.S. at 182.  Amendment is considered futile if the pleading, "as amended, would fail to state a claim upon which relief could be granted.'"  In re Merck & Co., Inc. Sec., Derivative & ERISA Litig., 493 F.3d 393, 400 (3d Cir. 2007) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)).  Rule 15 aims to offer "the maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities."  United States v. Thomas, 221 F.3d 435 (3d Cir. 2000) (citations omitted).

Vega's motion is erroneously styled as a motion for leave to supplement rather than a motion for leave to amend.  The motion seeks to add factual allegations and legal claims that were overlooked or ignored in the original complaint; it does not seek to add factual allegations that occurred after the filing of the original complaint.  See Garrett, 938 F.3d at 82.  We will nevertheless grant the motion in light of Rule 15's liberal amendment policy.  The allegations and claims that Vega seeks to assert in the motion appear to be factually related to the allegations made in the original complaint and it does not appear that amendment of the complaint would be inequitable or futile.

## IV.  Conclusion

We will grant Commonwealth defendants' motion to dismiss and Vega's motion to supplement.  (Docs. 12, 25).  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     March 1, 2023