## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PETER VEGA,** | : | **CIVIL ACTION NO. 1:22-CV-593** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. WETZEL,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This is a prisoner civil rights case filed pursuant to 42 U.S.C. § 1983.  Plaintiff, Peter Vega, alleges that defendant prison officials and medical personnel were deliberately indifferent to a serious medical need and committed medical malpractice when they failed to adequately treat his liver, kidney, and stomach conditions.  The case is proceeding on Vega's amended complaint.  Defendants Wetzel, Benning, Hauser, Mason, White, Easterday, Boyle, and Shah have moved to dismiss the amended complaint through three separate motions.  Defendant Shah's motion to dismiss will be denied.  The other motions to dismiss will be granted.

## I.   <u>Factual Background & Procedural History</u>

Vega has been incarcerated in Mahanoy State Correctional Institution ("SCI-Mahanoy") at all relevant times.  He filed his original complaint on April 22, 2022.  (Doc. 1).  Defendants Badick, Bora Saikia, Loscalzo, and Williams answered the complaint on February 3, 2023.  (Doc. 48).  Defendants Little, Mason, White, Wetzel, Hauser, and Doe moved to dismiss the complaint.  (Docs. 12, 47).  We granted the motion to dismiss on March 1, 2023, dismissed the claims against the moving

defendants without prejudice, and granted Vega leave to file an amended complaint. (Docs. 51-52). Vega filed a timely amended complaint on May 2, 2023. (Doc. 59).

According to the amended complaint, Vega suffered frequent headaches, vomiting, constipation, and stomach pain between the years 2018 and 2020. (Id. at 15). Vega purportedly complained to defendant Williams, a physician's assistant in the prison, that his institutionally prescribed medications—Gemfibrozil, Pravachol, and Lisinopril—were causing these symptoms. (Id.) Williams suggested changing Vega's medication, but rather than discontinuing his prescription for Pravachol, she allegedly increased his dosage from 20 mgs to 40 mgs. (Id.) Vega's symptoms continued. (Id.) Williams and "Dr. Roger" purportedly dismissed the symptoms as being caused by a stomach virus. (Id. at 15-16).

Vega was hospitalized for several days in May 2020.[1] (Id. at 16). Upon his return to the prison from the hospital, defendant Loscalzo, a doctor in the prison, allegedly diagnosed him with fatty liver. (Id.) The amended complaint avers that Loscalzo "made it sound like there's nothing to worr[y] about" with respect to the fatty liver diagnosis. (Id.) After performing tests, Loscalzo allegedly changed the diagnosis to an unspecified liver disease. (Id.) Defendant Badick, another doctor in the prison, diagnosed Vega with chronic anemia around this time. (Id.)

---

[1] The amended complaint does not state what caused this hospitalization, but the court takes judicial notice that Vega's original complaint alleged that he was hospitalized due to an obstruction in his stomach that purportedly caused vomiting and abdominal pain. (See Doc. 1 at 7).

After conducting testing in which Vega's "liver enz[y]mes kept coming back very high," Loscalzo purportedly asked Vega what medications he was taking.  (Id.) Vega told him he was taking prescribed Gemfibrozil, Pravachol, high blood pressure medications, and psychiatric medications.  (Id.)  Loscalzo double-checked Vega's list of medications on his computer and allegedly stated, "I told [Williams] to take you off this medication."  (Id.)  Loscalzo then walked out of the room, quickly returned, and stated, "I'm taking you off this medication right now."  (Id.)  Vega was purportedly taken to the hospital "several times," where he was treated for pain in his "vital organs" and diagnosed with liver damage, scarring of the liver, and cirrhosis.  (Id. at 16-17).

Sometime in October or November of 2020, Vega had a telemedicine appointment with Dr. Macelli, an oncologist at Lehigh Valley Hospital, who referred him to a liver specialist for a biopsy and endoscopy.  (Id. at 17).  Vega was transported to Geisinger Medical Center in January or February of 2021 for a consultation related to his liver cirrhosis and unspecified liver disease.  (Id.)  Vega was seen by defendant Shah, a doctor at the hospital.  (Id.)  Shah allegedly did not examine Vega or ask him any questions.  Instead, Shah asked his assistant why Vega had been brought to the hospital.  (Id.)  Shah supposedly directed correctional officers to return Vega to SCI-Mahanoy, but before departing Vega asked Shah whether the biopsy and endoscopy recommended by Macelli could be performed at the hospital.  (Id.)  After confirming with his supervisor that the procedures could be performed at the hospital, Shah scheduled them for April 2021.  (Id. at 17-18).

In May 2021, Vega had a telemedicine appointment with Macelli and Badick. (Id. at 18).  Macelli asked Vega if the biopsy and endoscopy had been performed and Vega told him they had not.  (Id.)  Badick then interrupted and told Macelli that someone in the prison had cancelled the appointment.  (Id.)  Badick purportedly represented that he would reschedule the biopsy and endoscopy, but the complaint asserts that the procedures were never done.  (Id.)

Defendant Bora Saikia began employment as a doctor in the prison sometime in July or August of 2021.  (Id.)  Vega met with Bora Saikia several times to discuss his liver problems and endoscopy.  (Id.)  Bora Saikia allegedly told Vega that he had very serious liver damage and cirrhosis of the liver.  (Id.)  Vega asked Bora Saikia why he was having liver complications after being in prison for 35 years.  (Id.)  Bora Saikia responded that Vega was a heavy drinker when he was younger and that liver complications could arise from heavy drinking even after 50 years.  (Id.)  Vega assured Bora Saikia that he had never been a heavy drinker.  (Id.)  Borak Saikia purportedly spoke with Shah shortly after this conversation and asked Shah to schedule Vega for an appointment at his earliest convenience.  (Id.)

Several weeks later, Vega was sent to the prison's medical department because he was feeling very sick.  (Id. at 18-19).  An unnamed nurse stated that she did not know what she could do to treat Vega's liver pain.  (Id. at 19).  The nurse called Bora Saikia, but Bora Saikia allegedly stated that she was busy examining another patient and could not examine Vega.  (Id.)  Defendant Williams then came to the examination room and examined Vega.  (Id.)  Williams expressed concern about Vega's condition, but stated that there was nothing she could do to treat his

liver condition, which she diagnosed as hepatomegaly.[2]  (Id.)  Defendant Badick

ordered Vega to be transferred to a hospital.  (Id.)  He was treated for his pain and

then returned to the prison.  (Id.)

On November 5, 2021, Vega signed up for a sick call and spoke with

defendant Williams, who confirmed that he was scheduled for an appointment with

Shah at Geisinger Medical Center on November 8, 2021.  (Id. at 20).  Vega was

transported to the hospital on November 8, 2021, but hospital staff informed the

correctional officers escorting Vega that there was no appointment scheduled that

day.  (Id. at 19).  Vega was transported back to the prison.  (Id.)

On November 16, 2021, Vega had a telemedicine appointment with Macelli

and Bora Saikia.  (Id.)  Bora explained that the appointment with Shah had been

canceled because Geisinger needed to switch doctors to treat Vega.  (Id. at 19-20).

Macelli stated that he could recommend appointments, but that it was up to the

prison's medical department to ensure that Vega was able to attend the

appointments.  (Id. at 20).

Vega spoke with defendant Williams during a sick call on December 9, 2021.

(Id.)  Williams assured Vega that she had not forgotten about him.  (Id.)  Williams

then placed a phone call to "Abby," the assistant to the prison's healthcare

administrator.  (Id.)  Abby came to the examination room and explained that she

---

[2] The court takes judicial notice that hepatomegaly is a medical term for an
enlarged liver.  See *Enlarged Liver*, MAYO CLINIC, https://www.mayoclinic.org
/diseases-conditions/enlarged-liver/symptoms-causes/syc-20372167 (last visited Mar.
11, 2024).

had spoken with Shah, who had stated that a biopsy was unnecessary at that time. (Id.)

Several days after his December 9, 2021 appointment with Williams, Vega went to the prison's medical department based on complaints of abdominal, liver, and kidney pain. (Id. at 21). Quito Weiser, a nurse in the prison, examined him and then called an outside doctor. (Id.) The doctor ordered immediate blood testing. (Id.) Weiser purportedly responded that no one in the prison was able to perform the blood testing at that time but that the testing could be done the following morning. (Id.) The next morning, Vega was examined by physician's assistant Westly Kiepea. (Id.) Kiepea obtained a urine sample from Vega, which tested positive for blood and kidney infections. (Id.) Kiepea prescribed him antibiotics and Motrin, ordered blood testing, and told him to come back ten days later if the pain continued. (Id. at 21-22).

Vega returned to the medical department in January 2022, where he was examined by defendant Christina Hauser, the prison's correctional health care administrator. (Id. at 22). Hauser allegedly obtained a urine sample from Vega, which was positive for kidney and blood infections. (Id.) Hauser, after unsuccessfully attempting to have an outside physician examine Vega that night, told him that he would need to stay in the medical department overnight before he could be examined by a physician's assistant in the morning. (Id.)

The next morning, Vega was examined by defendant O'Brien, a physician's assistant. (Id.) O'Brien asked him if he was still in pain and whether he was ready to go back to his housing unit. (Id.) Vega confirmed that he was ready to return to

6

the housing unit, and O'Brien discharged him, allegedly without examining Vega, without asking him questions as to why he was in the infirmary, and without prescribing additional medication. (<u>Id.</u>)

Vega attended sick call several days later. (<u>Id.</u>) Defendant Williams told him to go into an examination room. (<u>Id.</u>) Williams then allegedly "said something" to O'Brien, at which point O'Brien approached Vega. (<u>Id.</u>) The complaint avers that O'Brien "had an attitude resembling in his face" and asked Vega to come into his examination room. (<u>Id.</u>) Vega told O'Brien he would not go into the room unless a lieutenant was present because he did not want O'Brien to misconstrue anything he said. (<u>Id.</u>) Defendant Easterday, a correctional officer in the prison who was present at the time, asked Vega if he wanted him to come into the room, but Vega stated that he did not. (<u>Id.</u>) O'Brien allegedly told Vega to leave the infirmary because he was refusing treatment. (<u>Id.</u> at 22-23). Defendant Williams then purportedly came out of her examination room and said that Vega had also refused to go into an examination room with her. (<u>Id.</u> at 23). Vega responded, "why do you have to lie, you never asked me to come into your sick call room." (<u>Id.</u>) The complaint avers that Vega wanted a lieutenant to be present in the room with Vega and O'Brien because Vega had recently filed a grievance against O'Brien and he worried that O'Brien would retaliate against him, and because O'Brien had not treated him on his previous visit to the infirmary. (<u>Id.</u>)

Vega returned to his housing unit and spoke to defendant Mason, the prison's superintendent, during the prison's lunch hours. (<u>Id.</u>) Vega told her about the purported lack of medical care he was receiving. (<u>Id.</u>) Vega was summoned to

the medical department later that day, where he explained the incident with

O'Brien to defendants Bora Saikia and Hauser.  (Id.)  Vega was admitted into the

infirmary for several days and placed on an IV before being released back to his

housing unit.  (Id.)  On the day he returned to his housing unit, Bora Saikia

purportedly stated that she had spoken with Shah and that Vega would be

scheduled for a consultation for an endoscopy in the near future.  (Id.)

Vega continued to feel the same symptoms in the last week of January 2022

and sought treatment in the medical department.  (Id.)  Amie Bing, a nurse in the

prison, admitted Vega into the infirmary and obtained a urine sample, which was

allegedly positive for kidney and blood infections.  (Id. at 23-24.)  Bora Saikia placed

him on an IV and prescribed antibiotics and returned him to his housing unit.  (Id.)

Vega was given several blood tests and an ultrasound on his kidneys in

February 2022.  (Id. at 24).  Defendant Easterday escorted him to the hospital for the

ultrasound.  (Id. at 27).  Vega was told to wait in a hallway before the procedure

along with another inmate.  (Id. at 26-27).  Vega observed Easterday having a

conversation with the ultrasound technician, after which the technician called the

inmate who was sitting next to Vega to go into the room for an ultrasound even

though Vega was in the hallway before the other inmate.  (Id. at 27).

Nurse practitioner "Angela" reviewed the ultrasound results with Vega later

in February 2022 and informed him that his kidneys appeared to be functioning

normally and that he had a fatty liver.  (Id. at 24).  Vega explained that he had been

diagnosed with cirrhosis of the liver, liver damage, fatty liver, and an unspecified

liver disease, but Angela allegedly told him that the prison could not do anything for

him until his liver completely failed.  (Id.)  Vega then had a telemedicine appointment on February 10, 2022 with Macelli, who purportedly recommended that Vega be seen by a liver specialist other than Shah.  (Id.)

Vega spoke with defendant Mason in March 2022 and told her that his health was "deteriorating" and that his prostate was enlarged.  (Id. at 25).  Mason purportedly stated, "that's something that can be corrected."  (Id.)  Vega was called for sick call the next day and examined by Dr. Wheeler.  (Id.)  Wheeler allegedly found that Vega's liver was enlarged and informed Vega that he would be seen for an endoscopy in the next several months.  (Id.)

On March 7, 2022, Vega was sent to the medical department after he urinated blood.  (Id. at 25).  An unnamed nurse in the medical department examined him and obtained a urine sample, which allegedly contained an "excessive" amount of blood. (Id.)  Defendant Easterday, who was standing next to them, purportedly stated that he had "seen worse than that."  (Id.)  The nurse opined that Vega may have kidney stones and that if the kidney stones were too big there would be nothing that could be done for him at the prison.  (Id.)  He was called for mandatory sick call again the next day and spoke with defendant Williams.  (Id.)  Williams told him he would be referred for an ultrasound on his bladder.  (Id.)

On March 11, 2022, Vega had an appointment with defendant Bora Saikia, who asked him whether he had been taken to an outside hospital for the endoscopy. (Id. at 25-26).  Vega stated that he had not been taken anywhere.  (Id. at 26).  Bora Saikia then examined Vega's file, which allegedly showed that prison staff had been unsuccessfully attempting to reach Shah regarding Vega's endoscopy.  (Id.)  Bora

Saikia purportedly stated that she would personally contact Shah.  (Id.)  Bora

Saikia also stated that Vega continuing to urinate blood was not normal and that he

would be referred for an appointment with a urologist.  (Id.)  Finally, Bora Saikia

diagnosed Vega's liver condition as nonalcoholic steatohepatitis ("NASH"), which

causes fatty liver and cirrhosis not related to alcohol abuse.  (Id.)

Vega was scheduled for another ultrasound on June 30, 2022.  (Id. at 27).  He

was again escorted by defendant Easterday.  (Id.)  Vega allegedly observed

Easterday talking with the ultrasound technician and noticed that Easterday

appeared to be "n[e]rvous."  (Id.)  Easterday asked Vega whether he had been in the

infirmary several days before that and Vega confirmed that he had been.  (Id.)  Vega

purportedly "knew" based on the tone of Easterday's question that Easterday had

been talking about Vega with the technician.  (Id. at 27-28).  The technician

conducted the ultrasound as scheduled shortly after Vega's interaction with

Easterday.  (Id. at 28).

On July 3, 2022, Vega attended sick call to inquire about the results of his

ultrasound and spoke with physician's assistant Kiepea.  (Id.)  Kiepea stated that

the ultrasound showed a fatty liver, but no lumps, scarring, or lesions.  (Id.)  Vega

noticed Easterday "going back and forth at the front of the sick call room" before

stopping at the entrance of the room with his back facing Vega.  (Id.)  Vega

surmised that Easterday was trying to hear the conversation between him and

Kiepea.  (Id.)

Vega was sent to an outside hospital in August or September of 2022 with

complaints of pain in his liver and kidneys.  (Id.)  Doctors at the hospital allegedly

determined that he had suffered acute kidney injury and kidney failure due to the presence of multiple kidney stones and admitted him to the hospital.  (Id. at 28-29).

Vega was scheduled for another ultrasound in November or December of 2022.  (Id. at 29).  He again observed defendant Easterday speaking with the ultrasound technician during this appointment.  (Id. at 29).  The ultrasound was performed as scheduled.  (Id.)  Vega spoke with Kiepea in early December about the ultrasound.  (Id.)  Kiepea purportedly told him that the ultrasound showed that he was "full of [fecal] matter," which was the likely cause of the lower back pain he was experiencing.  (Id.)  Vega asked Kiepea whether the ultrasound showed anything abnormal with respect to his bladder or kidneys.  (Id.)  The complaint does not state whether Kiepea responded to this inquiry.  (Id.)  Vega told Kiepea that if she could read between the lines of the ultrasound report, she could see it was saying that Vega was "full if sh*t."  (Id. (alteration in original).)  Vega purportedly told Kiepea that he knew who was "doing this" and left the room.  (Id.)  Vega then saw defendant Easterday as he left the room, who supposedly turned "red as a tomato," upon seeing Vega.  (Id. at 29-30).

The amended complaint alleges that defendant Boyle, the former Chief Executive Officer of Wellpath, the third-party contractor providing medical services to SCI-Mahanoy, presided over a "corrupt corporation that provides inadequate health care services to inmates."  (Id. at 31).  The complaint asserts that Boyle was convicted of honest services mail fraud in 2021 based on a "scheme" that Vega "has reason to believe" was ongoing for approximately thirteen years.  (Id.)  Vega asserts that as part of this "scheme," Boyle and Wellpath arranged to provide generic and

substandard medications to inmates to save money.  (Id.)  Vega alleges that this scheme caused him to receive delayed and substandard medical care in violation of his constitutional rights.  (Id. at 32).

The complaint avers that prison physicians and healthcare administrators have delayed care for his liver, kidney, and stomach problems since they were first diagnosed in 2020.  (Id. at 34).  Vega further asserts that his conditions were caused by the medications prescribed by defendant Williams and the other medical professionals responsible for his care.  (Id.)  He states that he has stopped taking the medications due to his belief that they are causing him harm.  (Id.)  The complaint asserts claims for deliberate indifference to a serious medical need and medical malpractice against defendants Williams, Loscalzo, Baddick, Bora Saikia, Hauser, White, Mason, Benning, Wetzel, Boyle, Shah, O'Brien, Easterday, and two Jane Doe ultrasound technicians.  (Id. at 35-48).  We also liberally construe the complaint as attempting to raise a retaliation claim against Easterday.  (See id. at 30 (stating that Vega "has reason to believe" that Easterday has been "working in concert" with the Jane Doe defendants and Kiepea to falsify medical records as retaliation for Vega's claims against the other defendants)).

Defendants Wetzel, Benning, Hauser, Mason, White, and Easterday ("commonwealth defendants") moved to dismiss the amended complaint on May 22, 2023.  (Doc. 72).  Defendants Badick, Bora Saikia, Loscalzo, Williams, O'Brien, and Boyle ("medical defendants") moved to dismiss the claims against Boyle on June 2, 2023, and otherwise answered the amended complaint on the same day.  (Docs. 74, 76).  Defendant Shah moved to dismiss the amended complaint on July 17, 2023.

(Doc. 85).  Briefing on the motions to dismiss is complete and the motions are ripe for review.  Medical defendants have additionally moved to strike the certificate of merit from Vega's amended complaint.  (Doc. 90).  The motion to strike will be addressed in a separate order on the date of this opinion.

## II.    **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents."  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31

(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

Courts must liberally construe complaints brought by *pro se* litigants.  Sause v. Bauer, 585 U.S. 957, 960 (2018).  *Pro se* complaints, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

## III.   **Discussion**

Vega brings his constitutional claims under 42 U.S.C. § 1983.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law.  See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, plaintiffs must show a

deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Defendants Wetzel, Benning, Hauser, Mason, White, Easterday, Boyle, and Shah have moved to dismiss the amended complaint through three separate motions. We will address the motions *seriatim*.

### A.    Commonwealth Defendants' Motion

Commonwealth defendants seek dismissal of Vega's claims against them because the amended complaint fails to allege any facts with respect to defendants Wetzel and Benning and fails to state a claim upon which relief may be granted against defendants Hauser, Mason, White, and Easterday. (Doc. 78).

A defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation. Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 289 (3d Cir. 2018). The defendant's personal involvement cannot be based solely on a theory of *respondeat superior*. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, for a supervisor to be liable for the actions of a subordinate, there must be allegations of personal direction or actual knowledge and acquiescence. Id.

We will dismiss Vega's claims against Wetzel and Benning for failure to allege personal involvement because Vega does not allege any facts against these defendants or even mention them in the amended complaint other than naming them as defendants. (See generally Doc. 59).

The claims against Mason and White will likewise be dismissed for lack of personal involvement.  The only allegations against Mason are that Vega told her that he was in poor health on two occasions, while the only allegation against White is that Vega told her on one occasion that the medical department was not sharing sufficient information with him about his treatment.  (See Doc. 59 at 23, 25, 41). There are no allegations that Vega asked Mason or White to remedy the supposed lack of medical care or that they failed to do so in any way, nor are there any allegations that Mason or White acquiesced in the other defendants' alleged decisions to deny him medical care.

The claims against Hauser will be dismissed for failure to state a claim upon which relief may be granted.  Vega asserts claims against Hauser for deliberate indifference to a serious medical need and medical malpractice.  Prima facie claims of deliberate indifference require allegations of "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).  Medical malpractice claims under Pennsylvania law require allegations that (1) defendant owed plaintiff a duty of care; (2) defendant breached the duty; (3) defendant's breach was the proximate cause of plaintiff's injuries; and (4) plaintiff suffered damages as a result of the breach. Mitchell v. Shikora, 209 A.3d 307, 314 (Pa. 2019) (citing Hightower-Warren v. Silk, 698 A.2d 52, 54 (Pa. 1997)).  The only allegations against Hauser are that she examined Vega on one occasion in the prison's medical department, obtained a urine sample from him that was positive for blood and kidney infections, and then

admitted him into the infirmary overnight so that he could be examined by a physician's assistant the next morning.  (Doc. 59 at 22).  These actions are insufficient to allege deliberate indifference or malpractice.  Based upon the four corners of the amended complaint and assuming the truth of its allegations, Hauser diligently treated Vega and did not harm him in any way.  Moreover, there is no allegation that Hauser directed other defendants to deny Vega medical care or that she acquiesced in the denial of medical care.

The court will also dismiss the claims against Easterday for failure to state a claim upon which relief may be granted.  To state a claim for retaliation in violation of the First Amendment, a plaintiff must allege that (1) he engaged in constitutionally protected conduct; (2) the defendant took retaliatory action against him that was sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) there was a causal connection between the protected conduct and the retaliatory action.  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).  Causation may be pleaded by alleging either an unusually suggestive temporal proximity between the plaintiff's protected conduct and the defendant's allegedly retaliatory action or a pattern of antagonism coupled with timing.  Dondero v. Lower Milford Twp., 5 F.4th 355, 361-62 (3d Cir. 2021) (citing Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)).  Causation may also be implied by "the record as a whole."  Id. (citing DeFlaminis, 480 F.3d at 267).

Vega's amended complaint does not contain any factual allegations to support a causal connection between his protected activity and Easterday's allegedly retaliatory actions of falsifying documents.  The retaliation claim is based

solely on Vega's speculation that Easterday must have been retaliating against him because Vega observed him talking with other prison employees and ultrasound technicians.  (See Doc. 59 at 25-31).  There are no allegations of what was discussed in these conversations or any allegations to suggest that Easterday would have a motive to retaliate against Vega; the amended complaint simply alleges that Vega observed Easterday talking with other individuals and then speculates that they must have been discussing a retaliatory scheme against Vega.  (See id.)  These allegations are not sufficient to "nudge" his retaliation claim "across the line from conceivable to plausible."  Iqbal, 556 U.S. at 683 (quoting Twombly, 550 U.S. at 570 (internal alterations omitted)).

The deliberate indifference and malpractice claims against Easterday likewise fail to state a claim upon which relief may be granted.  There are no allegations that Easterday was involved in any way with Vega's medical care other than escorting Vega to appointments and otherwise being in physical proximity to the places Vega was receiving medical care.  (See Doc. 59 at 25-31).

Finally, the court will dismiss the claims against the Jane Doe defendants for failure to state a claim upon which relief may be granted.[3]  The only allegations against the Jane Doe defendants are that they performed ultrasounds on Vega as directed by other medical professionals.  This is insufficient to allege deliberate indifference to a serious medical need.

---

[3] The Jane Doe defendants have not been served with process or responded to the amended complaint, but the court may review the claims against them pursuant to the screening provisions of 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A.

**B.    Medical Defendants' Motion**

Medical defendants seek dismissal of all claims against defendant Boyle for failure to state a claim upon which relief may be granted and for failure to exhaust administrative remedies.  (Doc. 75).  Medical defendants have otherwise answered the amended complaint with respect to the claims against defendants Badick, Bora Saikia, Loscalzo, Williams, and O'Brien.  (Doc. 76).

We agree that dismissal of the claims against Boyle is appropriate for failure to state a claim upon which relief may be granted.  Vega alleges that Boyle and Wellspan—the company for which Boyle acted as CEO during the relevant period—enforced a policy to deny adequate medical care to Vega and other inmates, but like Vega's retaliation claim against defendant Easterday, the claim against Boyle is based on pure speculation.  The complaint alleges that Boyle was convicted of honest services mail fraud during the relevant period and posits that because of this conviction he and his company must have been denying adequate medical care to inmates.  The amended complaint does not allege any facts to support this assertion.  Vega's unsupported speculation is not sufficient to state a claim upon which relief may be granted against defendant Boyle.

**C.    Defendant Shah's Motion**

Defendant Shah seeks dismissal of Vega's claims against him because he was not acting under color of state law when he provided medical care to Vega and because the amended complaint fails to state deliberate indifference or malpractice claims against Shah upon which relief may be granted.

To establish that a defendant acted under color of state law, plaintiffs must show that the defendant "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Harvey v. Plains Twp. Police Dep't, 635 F.3d 606, 609 (3d Cir. 2011). There is no simple test for determining whether a defendant acts under color of state law, and the inquiry is specific to the facts of each case. Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009). Privately employed doctors providing healthcare to inmates in a state prison pursuant to a contract with the prison may be considered state actors. West v. Atkins, 487 U.S. 42, 54 (1988). By contrast, several courts in this district have held that a hospital and its employee doctors may not be considered state actors when inmates are transported to the hospital for care without a contract between the prison and the hospital. See, e.g., Butler v. Rajjoub, No. 3:15-CV-2395, 2017 WL 515119, at *3 (M.D. Pa. Feb. 17, 2017) (Mariani, J.); Hernandez v. Palakovich, No. 1:05-CV-1655, 2010 WL 4683822, at *7 (M.D. Pa. Nov. 10, 2010) (Kane, J.); Fullman v. Pa. Dep't of Corrs., No. 4:07-CV-79, 2007 WL 257617, at *2 (M.D. Pa. Jan. 25, 2007) (McClure, J.).

We will deny Shah's motion to dismiss the amended complaint for failure to allege state action because development of a factual record is necessary to resolve this issue. Vega alleges that Shah provided medical services to him pursuant to a contract with the DOC, while Shah asserts that he had no such contract. (See Doc. 59 at 45; Doc. 89 at 8 n.2). Whether a contract existed between Shah and the DOC or whether state action can be established by any other means are factual questions that we cannot resolve without a developed record.

We additionally find that the amended complaint states deliberate indifference and malpractice claims upon which relief may be granted against Shah.  It is alleged that Shah declined to treat Vega's liver condition for many months and that this lack of treatment contributed to the liver condition worsening.  Hence, we will deny Shah's motion to dismiss.

### D.    Leave to Amend

Before dismissing a civil rights complaint for failure to state a claim upon which relief may be granted, a district court must permit a curative amendment unless the amendment would be inequitable or futile.  Phillips, 515 F.3d at 245.  We find that additional leave to amend would be futile.  Vega has had multiple opportunities to state a claim upon which relief may be granted against defendants Wetzel, Benning, Hauser, Mason, White, Easterday, Boyle, and the Jane Doe defendants and has failed to do so.

## IV.    Conclusion

We will grant the motions to dismiss filed by Wetzel, Benning, Hauser, Mason, White, Easterday, Boyle, and the Jane Doe defendants, dismiss Vega's claims against those defendants without further leave to amend, and deny Shah's motion to dismiss.  The case will proceed as to Vega's claims against Badick, Bora Saikia, Loscalzo, Williams, O'Brien, and Shah.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    March 11, 2024